SLR:LDM:TYH
2012V01375

**12**　**662**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
In re the Seizure of:

A SUM OF FUNDS NOT TO EXCEED
$157,148.00 HELD AT JP MORGAN
CHASE BANK ACCOUNT NUMBER
920347333 HELD IN THE NAME OF
CARDOZO SEAFOOD INCORPORATED;
------------------------------X

**AFFIDAVIT OF
ANTHONY CARAMANICA
IN SUPPORT OF AN
APPLICATION FOR
SEIZURE WARRANT**

ANTHONY CARAMANICA, being duly sworn, deposes and states as
follows:

1.    I am a Special Agent with the United States
Department of Homeland Security ("DHS").   I have held the position
of Special Agent for approximately two years.   In addition, I was
a Postal Inspector with the United States Postal Inspection Service
for four years.   I have participated in the prosecution of numerous
narcotics and money laundering cases, including criminal narcotics
enterprises that specialize in the movement of multi-kilograms of
cocaine, and the transfers of millions of dollars in drug proceeds
to drug sources in the United States, Mexico, Central America and
South America.

2.    I am currently a member of the El Dorado Task Force
(the "Task Force"), which is comprised of federal, state and local
law enforcement officers.   The Task Force is organized and led by
the DHS and focuses on money laundering investigations.   Through my
work with the Task Force, I have participated in numerous

investigations relating to the laundering of illegal proceeds through the use of structured cash deposits.[1]

3.    This affidavit is submitted in support of the United States' request for a seizure warrant, pursuant to 18 U.S.C. §§ 981(b) and 982(b) and 21 U.S.C. §§ 853(f) and 881(b) for an amount of funds not to exceed $157,148.00 held at JP Morgan Chase Bank account number 920347333 (the "Target Account") held in the name of Cardozo Seafood Incorporated ("Cardozo"). Such funds constitute property involved in violations of 18 U.S.C. §§ 1956 and/or 1957, and are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and 982(a)(1)(A) and/or funds traceable to the sale of narcotics and subject to forfeiture pursuant to 21 U.S.C. §§ 853 and 881.

4.    I have not included each and every fact I know about this investigation in this affidavit. Rather, I am setting forth herein the facts that are required to establish probable cause for the seizure of funds on deposit in the Target Account.

**STATUTORY BACKGROUND**

5.    Pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1)(A), any property, real or personal, which is involved in a transaction or attempted transaction in violation of federal

---

[1] Pursuant to Sections 403 and 412 of the Homeland Security Act of 2002 (Pub. L. 107-296), in conjunction with a Delegation from the Secretary of Treasury (Treasury Order 100-16), certain powers previously held by the U.S. Customs Service, including the power under 18 U.S.C. § 981(b)(1) to seize property subject to forfeiture, were transferred to DHS.

money laundering laws, 18 U.S.C. §§ 1956 or 1957, and any property traceable thereto, is subject to forfeiture to the United States.

6.   Pursuant to 21 U.S.C. §§ 853 and 881(a)(6), all property, real or personal, which constitutes or is derived from proceeds traceable to the sale of a controlled substance or was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the sale of a controlled substance, is subject to forfeiture to the United States.

7.   This Court is empowered to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. §§ 981 and 982, 21 U.S.C. §§ 853 and 881, 21 U.S.C. § 853(f) and 881(b), and 31 U.S.C. § 5317(c), respectively.

## MONEY LAUNDERING

8.   Narcotics traffickers amass large cash proceeds from the sale of narcotics in the United States.  The traffickers, or those associated with the traffickers, frequently attempt to give the impression of legitimacy to those proceeds; i.e., to "launder" them by making the proceeds appear to have been generated by a legitimate source.  The traffickers must also devise various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, which are known source locations of narcotics, without alerting governmental or law enforcement agencies in either country.

9.   In order to accomplish this goal, narcotics

3

traffickers frequently utilize domestic and foreign banks and/or financial institutions in order both to make their narcotics profits appear to be from legitimate sources and to move those profits through the financial system into the countries where narcotics are produced.

10. A popular method to launder narcotics proceeds is for narcotics traffickers, through a third party, to "sell" their narcotics proceeds in the United States for pesos in Colombia. This practice, commonly known as the Black Market Peso Exchange ("BMPE"), is centered on a BMPE broker who can bring the drug dollars and the legitimate pesos together.

11. In a common BMPE scheme, a BMPE broker will identify a South American businessperson, who imports goods from places such as the United States, China, or Panama. The BMPE broker will offer the South American businessperson an opportunity to pay the debt owed to the exporter in the foreign country at a significant discount compared to making the payment through a South American bank. The South American businessperson who agrees to this scheme will then turn over the payment for the imported goods in the form of pesos to the BMPE broker who in turn will contact a Drug Trafficking Organization ("DTO"). When the BMPE broker contacts the DTO, the broker will offer the pesos in South America in exchange for the narcotics proceeds which are located in the United States.

4

12. The BMPE broker will then arrange to have the narcotics proceeds picked up by a member of the BMPE broker's organization. These money pick-ups will usually occur between two people who have never met before and will most likely never meet again. These pick-ups frequently involve several hundred thousand dollars in narcotics proceeds.

13. Following the money pick-up, the BMPE broker arranges to forward those funds to the exporter in the United States. This is frequently accomplished by remitting those funds directly to the exporter by depositing the narcotics proceeds into accounts held by the exporter. Frequently, these deposits can be made in different geographical locations, where the DTO is located, rather than transporting illicit dollars to the location where the exporter is located.

## BANK SECRECY ACT

14. The Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313 et. seq., also known as the Bank Secrecy Act (the "BSA"), was designed to combat money laundering and other crimes by imposing reporting requirements on virtually all transactions involving more than $10,000 in United States currency.

15. Specifically, under 31 U.S.C. § 5313(a) and its related regulations, when a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of U.S. coins or currency ("cash") in an amount greater than $10,000,

5

the institution shall file a Currency Transaction Report ("CTR") for each cash transaction, such as, by way of example, a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution. CTR's are filed with the Financial Crimes Enforcement Network ("FinCen") at the Detroit Data Center on forms that require, among other things, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

16.  Many individuals involved in illegal activities, such as narcotics trafficking and money laundering, are aware of the reporting requirements and take active steps to cause financial institutions to fail to file CTRs.  These active steps are often referred to as "structuring."  They involve making multiple cash deposits or withdrawals, in amounts less than $10,000, but which in the aggregate exceed $10,000, to multiple banks and/or branches of the same bank on the same day or consecutive days. Structuring is prohibited by 31 U.S.C. § 5324.

17.  Finally, pursuant to 31 U.S.C. § 5331 and related regulations, any trade or business that receives more than $10,000 in one or more related transactions, is required to collect personal identifying information of the customer, similar to that found on a CTR, and must file that information on a form filed with FinCen.  These forms are commonly referred to as "form 8300." Businesses that structure funds into their bank accounts will

6

frequently fail to file form 8300s in an attempt to further hide their cash activity.

### USE OF FOREIGN WIRE TRANSFERS IN THE BMPE PROCESS

18.  As discussed above, very often the first step involved in money laundering activities will be the placement of narcotics proceeds into the financial system for transporting and laundering purposes.  While the placement of narcotics proceeds into domestic banks is still a popular method for introducing illicit currency into the financial system, due to increased vigilance on the part of domestic financial institutions and enforcement of the BSA, it has become increasingly difficult for individuals to place illicit currency into bank accounts in the United States while avoiding detection by law enforcement.

19.  As a result, there has been a significant rise in the amount of bulk United States currency smuggled into Mexico and Central America.  Once that currency is in Mexico or a Central American country, it is deposited into foreign financial institutions, which are far more lenient in their reporting requirements and reporting of suspicious activity to governmental authorities.  Once the currency is in a foreign financial system, it can be wire transferred to virtually anywhere in the world, including back to the United States, where it can be used as payment for goods to be sent to South America as part of the BMPE.

7

20.  For instance, the rise in bulk cash smuggling into Mexico has been noted by several governmental agencies. Specifically the International Narcotics Control Strategy Report, published by the U.S. Department of State in March 2008, noted that "[t]he smuggling of bulk cash shipments of U.S. currency into Mexico and the movement of the cash back into the United States via couriers, armored vehicles, and wire transfers remains the favored methods of laundering drug proceeds." Additionally, on April 28, 2006, FinCen issued an advisory to all U.S. financial institutions warning of the increased threat posed by the bulk cash smuggling of narcotics proceeds into Mexico and the subsequent deposit of those proceeds into Mexican financial institutions.  Similarly, the 2007 National Money Laundering Strategy Report, produced by the U.S. Department of the Treasury, stated that bulk cash smuggling out of the United States is the "largest and most significant drug-money laundering threat facing law enforcement."

21.  Based upon statistics and reports compiled by the Federal Reserve Bank and FinCen, taking into account U.S. tourism spending and cash remittances to the United States, there was a difference of approximately $10 billion a year in 2007 and 2008 between the amount of currency that was declared leaving the United States through legitimate channels and the amount of currency repatriated back into the United States by Mexican

8

financial institutions.  While some of the discrepancy may represent legitimate, but unreported, currency movements, it is believed that a significant portion of that $10 billion is made up of narcotics proceeds that were bulk cash smuggled from the United States into Mexico and then deposited into Mexican financial institutions.

22.  Beginning in 2009 many U.S. based financial institutions started to exit the business of receiving repatriated U.S. currency from Mexico as a result of public reports of the suspected rise of narcotics dollars entering Mexico for placement into Mexican financial institutions. Moreover, in a further effort to restrict the ability of money launderers to place U.S. currency in Mexican financial institutions, in June of 2010, the Mexican Finance Ministry established new regulations severely restricting Mexican banks from receiving U.S. currency, except under relatively low thresholds.

23.  It is believed that these steps taken in the U.S. and Mexico will force even more of this narcotics derived bulk U.S. currency into Central America, where, with few exceptions, it remains much easier to place narcotics proceeds into financial institutions as compared with domestic and Mexican financial

institutions.[2]

24.   Additionally, the Task Force has traditionally conducted undercover "pick-up" operations wherein narcotics dealers provide narcotics proceeds to undercover law enforcement agents with the belief that those proceeds will be laundered by peso brokers as part of the BMPE.  Many of these pick-ups were conducted in the clandestine manner described above in the United States.  However, beginning several years ago, many peso brokers started requesting that the narcotics proceeds be picked up in Mexico due to the increased vigilance of U.S. financial institutions.  More recently, the Task Force has received requests from peso brokers to pick up narcotics proceeds in Guatemala and Honduras.  These changes observed directly by the Task Force are believed to be due to the developments described above occurring in Mexico.

## PRIOR INVESTIGATION

25.   On or about July 19, 2011, DHS seized bank accounts held in the name of Computer Storage & Periferals, LLC ("CSP") for BMPE related activity in violation of 18 U.S.C. § 981(a)(1)(A), and/or 21 U.S.C. § 881, and/or 31 U.S.C. § 5317(c). Several third-party wires originating from Central America were

---

[2]For instance, in the past few months, the Money Laundering Unit of the National Directorate for Special Investigative Services of Honduras has seized over $15 million dollars in foreign currency in Honduras.

seized as a result. These wires came from two companies, Conservis Internacional and Inversiones Marla. Both companies are located in Guatemala, a high-risk country. Similarly, on or about October 5, 2011 DHS executed a seizure warrant against SMT of America ("SMT") for BMPE-related activity. Several third-party wires were seized, all of which originated from Guatemala by way of Conservis Internacional and Inversiones Marla. Finally, on or about November 18, 2011 DHS executed a seizure warrant against Dishegua USA Incorporated ("Dishegua") for BMPE-related activity. Several third-party wires were seized, all of which originated from Guatemala by way of Inversiones Marla. Copies of the July 19, 2011, October 5, 2011, and November 18, 2011 seizure warrants and affidavits are attached hereto as Exhibit A.

26. A subpoena served on the Federal Reserve Bank confirmed that the following wires were sent to SMT of America:

| Guatemala Account | Date | Receiving Account | Amount | Instructions |
|---|---|---|---|---|
| Proinoser | 9/29/2011 | SMT of America | 32,732.00 | Re: Compuenter LTDA 48599 |
| Kibo Creativo y Productos | 8/30/2011 | SMT of America | 17,480.00 | Re: Compuenter LTDA 48503 |
| Arco Muebles y Projectos | 3/17/2011 | SMT of America | 33,100.00 | Re: Compuenter LTDA 47994 |
| Arco Muebles y Projectos | 2/4/2011 | SMT of America | 22,000.00 | Re: Latin Data LTDA 47810 |

27. On October 19, 2011, I interviewed the owner of SMT. She stated that she never did any business with customers

11

in Guatemala and that the wires she received from Conservis
Internacional and Inversiones Marla were for goods she sent to
her Colombian customers: Latin Data Ltda and Compuenter Ltda.
She then provided me with a list of her Colombian customers and
invoices relating to payments received from Guatemala.  Moreover,
she stated that SMT had received third-party payments from four
other Guatemalan accounts identified as Arcos Mueblas y
Projectos, Kibo Creavito, Prosioner S.A., and Inversiones
Reinomaya (the "Guatemalan Accounts").

        28.  A search of the internet for the companies
associated with the Guatemalan Accounts was negative.  The
address of 6-78 Avenida Las Americas, Zona 13, Guatemala is
listed as the address for Arco Muebles and Projectos, Kibo
Creavito, and Prosioner S.A.  An inspection of the location by
the HSI attache office in Guatemala revealed that the address
listed is a vacant office.  According to conversations with the
mailman who delivers in the area the office is seldom opened, and
if so, usually only opened for an hour or so.  Furthermore, the
mailman identified Rosemary Munoz Gonzalez as the person running
the business.  A records search revealed that Gonzalez is a
Colombian-born citizen, living in Guatemala City.  A check with
law enforcement databases indicated that both she and her husband
are suspected of narcotics money laundering with both the

Colombia and Sinaloa Cartel in Mexico.  When interviewed, Gonzalez indicated that she was in the remittances business.

29.  On January 27, 2012, the Honorable Joan M. Azrack, United States Magistrate Judge, Eastern District of New York, issued a seizure warrant for the accounts associated with twenty-five different U.S. exporters, finding probable cause to believe that the accounts were subject to seizure and forfeiture as property involved in violations of 18 U.S.C. §§ 1956 or 1957, or property traceable to such property, and/or 21 U.S.C. § 881, as funds traceable to the sale of narcotics.

30.  In February 2012, I interviewed Astok Jham, the owner of Jham International ("JHAM"). In the interview Jham revealed that he has received third-party wires from Inversiones Reinomaya.

31.  A subpoena served on the Federal Reserve Bank confirmed that the following wires were sent by Inversiones Reinomaya:

| Company | Date | Receiving Account | Amount |
|---|---|---|---|
| Inversiones Reinomaya | 6/14/11 | Quirch Foods | $13,500.00 |
| Inversiones Reinomaya | 7/13/11 | Ma Labs | $25,200.00 |
| Inversiones Reinomaya | 8/18/11 | Quirch Foods | $30,547.00 |
| Inversiones Reinomaya | 9/2/11 | Cardozo Seafood | $25,128.00 |
| Inversiones Reinomaya | 9/6/11 | Jham International | $19,210.33 |
| Inversiones Reinomaya | 9/9/11 | Cardozo Seafood | $40,000.00 |
| Inversiones Reinomaya | 9/14/11 | Cardozo Seafood | $22,370.00 |

| | | | |
|---|---|---|---|
| Inversiones Reinomaya | 9/20/11 | SMT of America | $17,495.00 |

Quirch Foods, Ma Labs, Jham International, and SMT of America have all had accounts seized by DHS, pursuant to court-authorized warrants, as property involved in money laundering or as funds traceable to the sale of narcotics.

32.   Based on the wire transfer activity described above, and the recent attempts of BMPE brokers to launder funds through high-risk countries like Guatemala, it is believed that (i) Conservis Internacional; (ii) Inversiones Marla; (iii) Arcos Mueblas y Projectos; (iv)  Kibo Creavito; (v) Prosioner S.A.; and (VI) Inversiones Reinomaya (the "Guatemalan Companies") are involved in the BMPE, as described above and in the affidavits in Exhibit A.

## FACTS

33.   Cardozo is a fish and seafood wholesaler incorporated in the state of Florida and located at 9015 SW 125th Avenue, Apartment 407, Miami, Florida 33186. Javier Cardozo is listed as the President. Javier Cardozo, Lilian Garcia, and Antonio Chalela are signatories on the Target Account.[3] Cardozo

---

[3] One of the accounts seized by DHS pursuant to the January 27, 2012 seizure warrant was held in the name of Antonio Chalela. The seized account received wire transfers from both Conservis Internacional and Inversiones Marla in the amount of $32,175.59.

does not appear to have a website and is not listed in the Yellow Pages.

34.   From September 2, 2011 to December 16, 2011, there were six (6) wire deposits made into the Target Account that originated from Inversiones Reinomaya, Inversiones Marla, Conservis International, and Proinoser SA.   The total amount of those wire transfers was $157,148.00.

| | | | |
|---|---|---|---|
| Inversiones Reinomaya | 9/2/2011 | $25,128.00 | 920347333 |
| Inversiones Reinomaya | 9/9/2011 | $40,000.00 | 920347333 |
| Inversiones Reinomaya | 9/14/2011 | $22,370.00 | 920347333 |
| Conservis International | 10/5/2011 | $19,650.00 | 920347333 |
| Inversiones Marla | 10/18/2011 | $25,000.00 | 920347333 |
| Proinoser SA | 12/16/2011 | $25,000.00 | 920347333 |

35.   Trade data from the Trade Transparency Unit ("TTU") revealed that Cardozo has never exported goods to Guatemala from 2009 to the present.

36.   As set forth above, there is probable cause to believe that a sum of funds on deposit up to $157,148.00 in the Target Account is involved in violations of 18 U.S.C. §§ 1956 and/or 1957, and therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and/or constitutes funds traceable to the sale of narcotics and therefore is subject to seizure and forfeiture pursuant to 21 U.S.C. § 881.

37.   Pursuant to 18 U.S.C. § 984, in any forfeiture action in rem in which the subject property is cash or funds deposited in an account in a financial institution, any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated:      Brooklyn, New York
            July 12, 2012

ANTHONY CARAMANICA
Special Agent
Department of Homeland Security

Sworn to before me this
12 day of July 2012

HONORABLE M
UNITED STATE
EASTERN DIST

16